**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: April 15, 2015
Date Decided: July 30, 2015

Michael A. Weidinger, Esquire
Kevin M. Capuzzi, Esquire
Pinckney, Weidinger, Urban & Joyce LLC
1220 North Market Street, Suite 950
Wilmington, Delaware 19801

John L. Reed, Esquire
Scott B. Czerwonka, Esquire
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801

Re: *Sequoia Presidential Yacht Group LLC et al. v. FE Partners, LLC*, Civil Action No. 8270-VCG

Dear Counsel:

I am unable to locate a legal-Latin expression or equitable maxim stating, pithily, that a judge should, in his own interest, beware entering orders in which the parties stipulate that the Court shall retain jurisdiction to resolve lurking issues. Such an expression or maxim would be apt here. This matter involves the former presidential yacht, *Sequoia* (the "Yacht"), whose owner, Plaintiff Sequoia Presidential Yacht Group LLC (the "LLC"), and its sole member, Plaintiff Gary Silversmith, co-induced Defendant FE Partners, LLC ("FE Partners") by means of fraud to extend the LLC a loan with the Yacht as collateral. I will not reiterate that particular facet of this case, which has been set forward at length elsewhere. It is sufficient to this Letter Opinion to note that the Plaintiffs brought this case to enjoin FE Partners from pursuing its rights in connection with the loan, that FE

Partners counterclaimed, and that once the fraud came to light, the Plaintiffs entered a stipulated order in default judgment on August 29, 2013 (the "Judgment Order"). Under the operative loan documents, which include the Amended and Restated Term Loan Agreement (the "Loan Agreement"), the First Priority Preferred Ship Mortgage (the "Mortgage Agreement"), the Guaranty, and the Amended and Restated Option Agreement (the "Option Agreement") (collectively, the "Loan Documents"), FE Partners had an option to purchase up to a 100% interest in either the LLC or the Yacht itself (the "Option"), either at an enterprise value of $7.8 million in the case of a default by the Plaintiffs of the Loan Documents, or otherwise at an enterprise value of $13 million. As of the time of the default judgment, FE Partners had given notice to the Plaintiffs of its intent to exercise the Option to purchase a 100% interest in the Yacht. The Judgment Order provided that FE Partners was entitled to exercise its rights under the Loan Documents, specifically including the Option, and further that the final option price would be determined by deducting, among other things, the LLC's or the Yacht's outstanding liabilities, whichever is applicable, from the $7.8 million default enterprise value (the "Default Option Price"). To facilitate FE Partners' exercise of the Option, the Judgment Order also provided for the appointment of an independent counsel to determine outstanding current and potential liabilities of the LLC and the Yacht (the "Sequoia Liabilities"). Notably, the Judgment Order

2

retained this Court's jurisdiction to hear disputes arising out of the "accounting and calculation of the final Default Option Price" in connection with the independent counsel's investigation, as well as "any disputes arising out of the interpretation and enforcement of this order."[1]

After entry of the Judgment Order, Michael M. Maimone, Esquire, was appointed independent counsel (the "Independent Counsel") and produced a detailed report concerning the Sequoia Liabilities (the "Report"). The Plaintiffs have accepted the Report, while FE Partners vehemently disagrees with the conduct of the Independent Counsel and his conclusions regarding contingent liabilities that may constitute liens against the LLC or the Yacht. The parties have expended disproportionately large legal efforts to place their respective positions before this Court. The initial loan, under which FE Partners provided approximately $2.5 million to Silversmith, has resulted in Independent Counsel fees alone of $857,487.26. Moreover, and in validation of the chimerical maxim alluded to above, my entry of the Judgment Order has placed the issues of the parties' rights under that Order, together with the validity of the conclusions in the Independent Counsel's Report, before the Court. Meanwhile, a tangible piece of American history sits deteriorating on a marine railway on the Western Shore, awaiting resolution of the legal issues that complicate its future.

---

[1] Order dated Aug. 29, 2013, ¶¶ 7, 8.

*A. Factual Background*

The Parties executed the Loan Documents, including the Option Agreement, on July 3, 2012. Pursuant to the Option Agreement, FE Partners' right to exercise the Option was to last for five years from that date or until the maturity of the loan, whichever was later. The Option Agreement also provided that, before FE Partners could exercise the Option, it had to provide the Plaintiffs with written notice specifying the size and nature of the interest it intends to purchase and the contemplated closing date, but that "FE Partners may, in its sole and absolute discretion, elect to rescind an Exercise Notice at any time prior [to] the consummation of the purchase contemplated therein for any reason or for no reason."[2]

The Loan Agreement called for an initial funding of $5 million in loan proceeds. FE Partners funded $2,501,272.67 towards these initial proceeds before halting funding, purportedly after discovering that the LLC was in breach of a number of provisions in the Loan Agreement. After delivering a number of default notices to the LLC, on November 24, 2012, FE Partners delivered to the Plaintiffs a notice that it was "exercising the option granted pursuant to [the Option Agreement] to purchase all of [the LLC's] interest in the [Yacht]," with closing to

---

[2] Compl. Ex. 3, § 4(a).

4

take place on December 1, 2013 (the "First Option Notice").[3] The First Option Notice stated that, because FE Partners' exercise of the Option stemmed from the LLC's uncured default of the Loan Documents, the purchase price for the Yacht would be $7.8 million.

On February 1, 2013, the Plaintiffs filed their Verified Complaint in this action seeking to enjoin FE Partners from exercising the Option. On June 13, 2013, after preliminary discovery, FE Partners filed a Motion for Default Judgment and Other Sanctions for Fabrication of Evidence, Alteration of Evidence, Destruction of Evidence and Witness Intimidation, alleging several instances of misconduct on behalf of the Plaintiffs. As a result of that Motion and the conduct alleged therein, the Plaintiffs consented to a default judgment against themselves and in favor of FE Partners on all the parties' claims and counterclaims, as well as the shifting of FE Partners' attorneys' fees and expenses. However, the parties could not come to an agreement on several of the terms of the final default judgment order, including how the default judgment would affect the purchase price for FE Partners' Option. Both parties agreed that the approximately $2.5 million loan proceeds already delivered to the LLC would be deducted from the option purchase price, that the option purchase price should be based on an enterprise value of $7.8 million because the Plaintiffs were in default of the Loan

---

[3] Compl. Ex. 10.

Documents, and that the Plaintiffs had to deliver the Yacht or LLC membership interest, whichever is applicable, free and clear of any liens at that price. However, due to its lack of trust in the Plaintiffs to deliver free and clear title and its express interest in obtaining the Yacht as part of any remedy, FE Partners lobbied the Court for a system, problematic on its face, whereby FE Partners would assume control over ensuring clear title: it would investigate and determine the Sequoia Liabilities and deduct those liabilities from the $7.8 million default enterprise value. FE Partners also sought the right to deduct its award of attorneys from the option purchase price and to seek damages against the Plaintiffs in the case that, as a result of all of the deductions, the option purchase price fell below $0.00. The Plaintiffs argued that the Option Agreement did not give FE Partners a right to determine the Sequoia Liabilities, and thus too the option purchase price; they also objected to the inclusion of an express right to damages tied to the option purchase price. Conceding that they had an obligation to deliver either the LLC or the Yacht free and clear of any liens, however, the Plaintiffs offered instead to pay for a neutral third party "to aid in clearing the title to ensure it occurs."[4] The parties submitted their competing proposed orders along with a stipulation that a default judgment would be entered against the Plaintiffs and in favor of FE Partners and

---

[4] Pls.' Letter to the Court dated July 17, 2013.

that they consented to the Court's determination of the specific form of judgment order carrying out that default judgment.[5]

On August 29, 2013, I entered the Judgment Order, which combined many of the provisions from the Plaintiffs' and FE Partners' proposed orders. Among other things, the Judgment Order permits FE Partners to pay the reduced Default Option Price based, in part, on the Sequoia Liabilities, but calls for independent counsel to determine those liabilities.[6] Specifically, the Judgment Order provides that the Default Option Price will be calculated by deducting from the $7.8 million default enterprise value under the Option Agreement: FE Partners' attorneys' fees and expenses then-incurred, to be determined according to the process laid out elsewhere in the Judgment Order; the amount of proceeds FE Partners had extended under the Loan Agreement; and, as determined by independent Delaware counsel at the Plaintiffs' expense, the amount of:

> the outstanding and pending or potential tax or other applicable liabilities of [the LLC] that must be satisfied to deliver all legal and beneficial right, title and interest in and to either the membership interests in the [the LLC] or [the LLC's] interest in the [Yacht], in each case free and clear of all liens, encumbrances, claims, rights of first refusal, options, warrants, calls, security interests, charges, pledges, or restrictions on transfer of any nature whatsoever. With respect to any exercise of the option for the interest in [the LLC], the

---

[5] *See* Stipulation Regarding Default Judgment dated Aug. 7, 2013.
[6] Order dated Aug. 29, 2013, ¶¶ 2(c)(i), 5, 6.

final Default Option Price will be further reduced by the amount necessary to satisfy all outstanding debts against the [the LLC].[7]

The Judgment Order provided that, if after making these adjustments, the Default Option Price amounted to a negative figure, FE Partners could seek damages against the Plaintiffs.[8] Further, it states that "[a]ny disputes arising out of the accounting and calculation of the final Default Option Price . . . shall be brought exclusively in the Delaware Court of Chancery," as well as that this Court "shall retain jurisdiction for any dispute arising out of the interpretation or enforcement of this Order."[9] Shortly after the Judgment Order, the parties stipulated to the appointment of Mr. Maimone, the Independent Counsel, to determine the Sequoia Liabilities in furtherance of the Judgment Order.[10]

The Independent Counsel was not able to complete his work by December 1, 2013, the day that FE Partners was to close on its purchase of the Yacht under the

---

[7] *Id.* ¶ 6. I note that this Paragraph refers to liabilities attaching to either the Yacht or the LLC, while Paragraph 5, which provides for the future appointment of independent counsel, refers only refers to liabilities attaching to the Yacht. This discrepancy is no doubt a remnant of the fact that, at the time, FE Partners' expressed intent—via the First Option Notice—was to purchase the Yacht, not the LLC. That contemporary understanding is further evidenced by my letter to counsel accompanying the Judgment Order, which stated that "I have included the Plaintiffs' suggestion that I appoint an independent attorney to oversee the sale of the Sequoia Presidential Yacht to FE Partners, LLC." Letter to Counsel dated Aug. 29, 2013. It is not necessary for me to determine what effect this discrepancy has on the role of the Independent Counsel, however, because the parties submitted a subsequent stipulation, which was entered as an order of this Court, that the independent counsel would determine the outstanding liabilities attaching to the Yacht and the LLC. *See* Stipulation and Order Confirming Appointment dated September 30, 2013.

[8] *Id.* ¶ 7.

[9] *Id.* ¶¶ 7, 8.

[10] Stipulation and Order Confirming Appointment dated Sept. 30, 2013.

8

First Option Notice. Instead, on that day, FE Partners provided the Plaintiffs with written notice that it was rescinding the First Option Notice and, in its place, "exercising the option granted pursuant to [the Option] Agreement to purchase 100% of Silversmith's interests in [the LLC]," with closing to take place on December 1, 2014 or such earlier date that the Independent Counsel's investigation is completed and accepted by this Court (the "Second Option Notice").[11] The Second Option Notice provided that the purchase price for the LLC at closing would not be the price called for in the Loan Documents—under which the property transferred was to be free and clear of liens—but rather would be at the Default Option Price, as defined in the Judgment Order. It further stated that FE Partners reserved its right to amend the notice in the future to instead purchase the Yacht.

Shortly after its Second Option Notice, in a meeting on December 3, 2013, FE Partners communicated to the Independent Counsel its interest in purchasing the LLC rather than the Yacht.[12] In the same meeting, FE Partners suggested to the Independent Counsel that the liabilities of *both* the LLC and the Yacht (both secured and unsecured) be satisfied at the closing of the sale of *either* the LLC *or* the Yacht by Plaintiffs to FE Partners.[13] In other words, FE Partners proposed that

---

[11] Capuzzi Aff. in Supp. of Pls.' Mot. to Enforce Def.'s Compliance with Final Order, Ex. I.
[12] Report of Ind. Counsel at 15.
[13] *Id.*

the Default Option Price reflect the combined outstanding current and potential liabilities of the LLC and the Yacht, regardless of which of the two assets was actually being purchased in the exercise of the Option. The Independent Counsel subsequently relayed FE Partners' suggestion to Silversmith, who purportedly agreed to the term.[14]

By letter dated May 20, 2014, the Independent Counsel notified the Court that it had reached a preliminary finding as to the Sequoia Liabilities and that a final report would be forthcoming. Before he could issue a final report, the Plaintiffs on August 13, 2014 moved for the Court to enforce FE Partners' compliance with the Judgment Order. Specifically, the Plaintiffs asked the Court to:

> (a) excuse all interest on the Loan since the December 1, 2013 closing date that FE Partners selected and later rescinded on that date; (b) direct that the Independent Counsel's fees be shared equally by the parties due to FE Partners' bad faith and lack of cooperation; (c) compel FE Partners to either (i) close on the Option Agreement to purchase the [Yacht] (as suggested by Independent Counsel) within 30 days after the determination of this Motion, or (ii) accept rescission of the transaction, *i.e.*, full payment on the Loan, including legal fees as ordered by the Court; and (d) order FE Partners to pay Plaintiffs' attorneys' fees and costs, together with interest . . . , incurred in connection with this Motion and any subsequent briefing or hearing thereon.[15]

---

[14] *Id.* at 17.
[15] Pls.' Opening Br. in Supp. of Their Mot. to Enforce Def.'s Compliance with Final Order at 36–37.

In a teleconference with the parties on October 3, 2014, I determined that the Plaintiffs' Motion was premature, and should await the Independent Counsel's final report.

The Independent Counsel submitted the Report on October 15, 2014, in which he determined the Sequoia Liabilities to be $171,634.65. FE Partners filed its objections to the Report on January 16, 2015, attacking both the legal conclusions of the Independent Counsel and his impartiality, and asking the Court to disregard the Report in its entirety. Following further briefing, including a Supplement to the Report in which the Independent Counsel responded to the objections raised by FE Partners, I heard oral argument on April 10, 2015, on FE Partners' objections to the Report and the Plaintiffs' Motion to Enforce Defendant's Compliance with the Final Order.[16] This Letter Opinion addresses both of these issues.

*B. Objections to the Independent Counsel's Report*

I turn first to FE Partners' objections to the Independent Counsel's findings in the Report as to the Sequoia Liabilities.[17] FE Partners' briefing on its objections

---

[16] Following argument, the Independent Counsel, at my request, submitted an affidavit of his fees on April 15, 2015, at which time the matter was fully submitted.

[17] As a preliminary matter, I note that in its brief in response to the Report and at oral argument, FE Partners alluded, in a conclusory fashion, that its due process rights would be violated if the Court were to do anything with the Independent Counsel's report besides reject it outright. Even if I assume that the issue is properly before me, I note that FE Partners was given three months to present its objections to the Report, as well as the opportunity to submit document evidence in support of its objections, which it did, and the opportunity to present its objections and

11

focused on two issues: what FE Partners considers the inappropriate communications and "bias" in favor of the Plaintiffs exhibited by the Independent Counsel; and the Independent Counsel's conclusion regarding contingent liabilities which may constitute a lien against the Yacht or the LLC. In addition, at argument, FE Partners raised a related issue: whether the Independent Counsel had himself violated the Judgment Order in not reaching resolution of tax liabilities or violations of liquor laws which may impair the value of the Yacht or the LLC. Due to all of these issues, FE Partners argues that I should disregard the Report. FE Partners' arguments, however, are without merit.

### 1. Independent Counsel Complied with the Judgment Order

I will consider first FE Partners' argument, raised for the first time at oral argument, that the Report should be discarded because the Independent Counsel failed to comply with the Judgment Order by not obtaining certain settlements or releases relating to tax and liquor laws. To the extent that FE Partners did not waive this argument by failing to raise it in the briefing, I nevertheless disagree

---

supporting evidence in a full hearing. In addition, as I find below, I find no merit to FE Partners' argument that the Independent Counsel was anything but an impartial arbiter of the Sequoia Liabilities, and, in any event, I have conducted an independent evaluation of those liabilities.

To the extent that FE Partners argues that it is disadvantaged by having entered a default judgment that precludes it from demonstrating the amount of contingent liabilities at a full trial on the merits, I point out that the parties agreed to a default judgment, provided competing proposed forms of order for that default judgment, and consented to the Court both crafting a final order and interpreting that order. As detailed in this Letter Opinion, that order provided benefits to FE Partners not conferred by the Loan Documents. Having accepted those benefits, FE Partners cannot now complain that it has been deprived of the advantages of the forgone trial.

12

with FE Partners' interpretation of the Judgment Order. Pursuant to the terms of the Judgment Order and the subsequent stipulation and order appointing Mr. Maimone as the Independent Counsel, the Independent Counsel was charged with determining the Sequoia Liabilities, that is, any liabilities of the Plaintiffs that encumber or could encumber the Yacht or the LLC, and the Plaintiffs were charged with "enter[ing] into any agreements, compromises, settlements or arrangements for payments to insure that clear title to the [Yacht] may be delivered to FE Partners at closing consistent with findings of the [Independent Counsel]."[18] The Judgment Order provides that:

> the respective amount of the outstanding tangible personal property tax sales and use tax and other applicable taxes for the District of Columbia and other relevant jurisdictions, if any, shall be determined and established by written agreement of the parties and/or settlements between the District of Columbia government, the government of such other jurisdictions, if any, and the Plaintiffs.[19]

It also states that any alleged, outstanding, or pending liability for possible violations of the liquor laws or the District of Columbia, Maryland, or Virginia "shall be determined and established, or satisfied and resolved, as the case may be, as the [relevant] governments shall require."[20] As I read the language quoted above, the Independent Counsel was to determine the Sequoia Liabilities; it is up to the parties to take action to resolve them at or before closing. Therefore, the

---

[18] Order dated Aug. 29, 2013, ¶ 5.
[19] *Id.* ¶ 6.
[20] *Id.*

13

Independent Counsel did not violate the Judgment Order by failing to resolve these liabilities.

### 2. Independent Counsel Was Not Biased

I next turn to the allegations that the Independent Counsel acted inappropriately out of bias toward the Plaintiffs. I have reviewed the extensive, and often *ad hominem*, complaints of the parties in this regard, which are of an unfortunate whole with the progress of this litigation in general. In short, I find nothing indicating that the Independent Counsel did anything other than faithfully execute his duties arising under the Judgment Order, as he reasonably construed those duties.

### 3. Independent Counsel's Determination of the Sequoia Liabilities is Accepted

FE Partners' more serious, although still unavailing, arguments involve whether there should be some adjustment to the contingent liability section of the Report. I address each of these arguments, in turn, below.

FE Partners' directs much of its attention in its objections to the determination of tax liabilities. In the Report, the Independent Counsel determined that the Plaintiffs' total District of Columbia tax liability, including liability for personal property taxes, sales and use taxes, and unincorporated franchise taxes, which liability could pose a lien against the Yacht, totaled approximately $87,000.00, including interest then accrued (I assume interest and penalties are still

14

accruing). In reaching that conclusion, the Independent Counsel relied upon an audit conducted by the District of Columbia Office of Tax and Revenue as to the LLC's and Silversmith's tax liability. FE Partners argues that its evaluation of the tax liability is much higher, up to $10 million in fact, and further that the figure quoted by the District of Columbia Office of Tax and Revenue is meaningless because Silversmith induced the settlement of his tax liability through fraud. However, through his interaction with the District of Columbia Office of Tax and Revenue, the Independent Counsel has determined that the approximately $87,000.00 figure is a "final" amount. I therefore adopt that amount together with interest and penalties it has accrued in the interim as the operative figure for the Plaintiffs' District of Columbia tax liability.

Next, FE Partners argues that the Independent Counsel's determination that no sales or use tax was owed for Virginia or Maryland, and further that no lien for illegal alcohol sales was reasonably likely to arise against the Yacht from any jurisdiction, was based on insufficient evidence. It is true that the Independent Counsel failed to prove a negative, but because he has been informed by the District of Columbia government that no liability for alcohol will be asserted, and because no liability has been asserted by Maryland and Virginia for taxes or alcohol sales, I find the conclusion of the Report that these items should not factor into the Sequoia Liabilities to be reasonable.

Next, FE Partners contends that liability for certain loans to the LLC and Silversmith personally constitute Sequoia Liabilities. The allegation that the loan from Arkadi Urman to Leonid Zharkovsky, and in turn from Zharkovsky to Silversmith, could constitute a lien against the Yacht or the LLC is disproved by the releases executed by Urman and Zharkovsky that the Independent Counsel has in hand. Similarly, I independently agree with the Independent Counsel's conclusion that the personal loan by Conrad Muhly to Silversmith does not constitute a lien against the Yacht or the LLC.

Next, FE Partners points to an approximately $1 million judgment owned by a corporate entity, EnviroFinance Group LLC, which has a remote, but according to FE Partners, tangible possibility of resulting in a lien against the Yacht or the LLC. This concern is moot, as an FE Partners-related entity has acquired the right to recover this judgment against Silversmith, as "insurance." The seriousness of the risk that this judgment might support a lien against the Yacht or LLC is, moreover, adequately demonstrated by noting that the FE Partners-related entity purchased the right to enforce the judgment against Silversmith himself for only $5,000.00 plus a sharing of any recovery with the creditor.

Finally, FE Partners raises a number of additional, scatter-shot objections to the Independent Counsel's conclusions in the Report, including alleged potential liability in connection with outstanding amounts due to past and current crew,

16

inadequate insurance coverage, missing log books, and legal and other professional fees. I find these objections to be unavailing for the same reasons set forth by the Independent Counsel in the Report and the Supplement to the Report.

### 4. Conclusion

After considering *de novo* each of the arguments raised by FE Partners, along with the record generated as to the Sequoia Liabilities by both FE Partners and the Independent Counsel, and for the foregoing reasons, I independently conclude that FE Partners' arguments are without merit and the Report of the Independent Counsel as to the Sequoia Liabilities is accepted in toto.

### C. Plaintiffs' Motion to Enforce Compliance with the Judgment Order

### 1. Exercise of the Option

I now address the parties' rights going forward. In the Loan Documents, FE Partners purchased an option right upon default which persists until at least five years from the contracting date, that is, at least until July 3, 2017. The Option Agreement allowed FE Partners, upon default, to specify a date upon which the Option would be exercised, no sooner than seven days after notice, but also to cancel the exercise of the Option at any time prior to closing. The parties disagree as to what rights in the Option would remain upon such a cancellation: FE Partners argues that it received the right to serially cancel and renew notices to exercise the Option cabined only by good faith; the Plaintiffs argue that the Option,

17

once noticed and then cancelled, was not thereafter exercisable. I assume for purposes of this Letter Opinion that FE Partners' interpretation is correct.

However, that leaves the question of how those rights were modified in the Judgment Order. The Judgment Order was crafted, with the express consent of the parties, to allow FE Partners to consummate its desire and contractual right to purchase the Yacht or the LLC at the default enterprise value, free and clear of liens. The parties were, therefore, in search of a mechanism to ensure that the price paid was reduced to allow FE Partners to clear the property. The mechanism suggested by the Plaintiffs, which I ultimately embodied in the Judgment Order, was to employ independent counsel at the Plaintiffs' sole expense to determine the proper adjustment to the purchase price to account for liens. The parties agreed that I would retain jurisdiction to resolve disputes about the proper exercise price and the interpretation of the Judgment Order.

The Plaintiffs ask me to provide an exercise date for the Option, by which FE Partners must close on the Yacht or the LLC, or relinquish the Option and pursue its other contractual remedies. FE Partners, however, contends that, despite the Judgment Order and the consummation of the determination of the Sequoia Liabilities (and thus in turn the Default Option Price) called for therein, it can withdraw its notice of exercise of the Option, and then at any time during the remaining Option period re-notice and buy the Yacht or the LLC, presumably

18

under the conditions as then obtain. FE Partners points out that the Judgment Order provides that "the Loan Documents are valid and binding obligations of the Sequoia parties, enforceable against the Sequoia parties in accordance with their terms and the Sequoia parties are in default thereunder;"[21] that "the Sequoia parties ha[ve] no defenses, setoffs, claims, controversies, counterclaims or causes of action of any kind or nature whatever against FE Partners;"[22] and that FE Partners "is entitled to exercise any or all of its rights under the Loan Documents," including both "[i]ts Option to acquire' the Yacht or the LLC "based upon a $7.8 million default enterprise value . . . reduced as provided in this Order and Judgment," and the "remedies available to FE Partners pursuant to the [Loan Documents]."[23] FE Partners concludes from this language that its rights, including the serial notice and rescission right accompanying its Option, remain through the end of the Option period.

FE Partners' position is fundamentally incompatible with not only the Judgment Order, but also with the representations of FE Partners' counsel at the time I was considering that Order. At the telephone conference at which the parties presented their competing proposed forms of order for the default judgment, from which forms I crafted the Judgment Order, I expressed my concern

---

[21] Order dated Aug. 29, 2013, ¶ 2(a).
[22] *Id.* ¶ 2(b).
[23] *Id.* ¶ 2(c).

that FE Partners might contend that it could decide to forgo closing upon a determination of price under the proposed order and instead exercise the Option later in the contractual Option period, which concern was squarely put to bed by counsel for FE Partners:

> [COUNSEL FOR FE PARTNERS]: Part of the complicated process—the thing that complicates this [default judgment order] is this was principally a declaratory judgment action on both sides. From our perspective, the core of our action was seeking of [a] declaration that they were in default under the applicable agreement, and we were, therefore, entitled to exercise at the default option price of 7.8 as opposed to 13.
>
> Our proposed form of order does what you would expect if the Court were entering a default judgment on all the claims and counterclaims in the case. It determines that the plaintiffs were in default under the applicable agreement. It determines that FE Partners has the right to exercise its option at the default option price. It preserves all of our remedies under the bargained for provisions of the applicable agreements, and it awards reasonable attorneys' fees. It describes how the default option price is to be calculated. And while it contemplates future jurisdiction for enforcement of the order, it does not involve any kind of continued, you know, recurrent involvement or monitoring by the Court.
>
> THE COURT: Does it provide that FE Partners has five years to decide whether to exercise on the option?
>
> [COUNSEL FOR FE PARTNERS]: Well, Your Honor, that's what the agreement says. We are 18 months into an agreement that said we have five years to do that. . . .
>
> THE COURT: But surely the parties didn't contemplate that there would be a default judgment before the loan was fully advanced, but that the full five-year term could be used before a closing at the default rate, did they?
>
> [COUNSEL FOR FE PARTNERS]: No, Your Honor.
>
> THE COURT: That can't be the case.
>
> [COUNSEL FOR FE PARTNERS]: No, I agree. The reason I raise the five years in our letter is because what I'm saying is we shouldn't be bound by any absolute time line to be able to determine

20

what the actual enterprise value is, which is what the default is. The default is—

This is really the principal hang up in the entire order; otherwise, this would be very, very easy. How do you determine what the default price is? . . .[24]

I relied on these representations of counsel in crafting the Judgment Order. That Order did not simply enforce FE Partners' rights under the Option Agreement, it also modified those rights, with the Plaintiffs' consent, in FE Partners' favor. The Judgment Order appointed independent counsel to determine potential liabilities against the Yacht and the LLC to ensure that FE Partners would receive clear title upon exercise of its Option, and it further provided a mechanism whereby FE Partners could pay the reduced Default Option Price for such liabilities that it assumed at closing. I note also that the parties subsequently agreed to an amendment to this latter right whereby FE Partners would be entitled to reduce the option purchase price even by liabilities that it would *not* assume at closing, that is, liabilities attached to the LLC would reduce the price even if FE Partners bought only the Yacht. The Judgment Order placed the cost of the price-determining mechanism—the Independent Counsel—solely on the Plaintiffs. Pursuant to that obligation, which arose solely under the Judgment Order and not the Loan Documents, the Plaintiffs have become responsible for over $850,000 for the Independent Counsel alone. This does not include the very substantial legal

---

[24] Teleconference Tr. 14:17–16:22 (Aug. 7, 2013).

21

fees and other expenses the Plaintiffs themselves have incurred in connection with this process.

The process described above has now made it possible to determine the Default Option Price, based upon the Sequoia Liabilities, as determined by the Independent Counsel. FE Partners has exercised its right, under the Judgment Order, to contest certain of the Independent Counsels' findings before this Court, and to submit evidence by affidavit and argument in support of its position. I have, based on the report of the Independent Counsel and in light of FE Partners' submissions, decided the Sequoia Liabilities from which the Default Option Price can be calculated. It is clear that FE Partners may exercise its Option at this price, or forgo the Option to pursue its other rights under the Loan Documents. To say, as FE Partners does, that it may forgo the Option at this price and then tomorrow or some other day again elect to exercise the Option, which FE Partners makes clear it believes would require an entire recalculation of the option purchase price, would be to render the process described above potentially an expensive nullity. FE Partners has consistently represented that what it wants to do is buy the Yacht or the LLC. It was never my intention in entering the Judgment Order to put in place a costly and exhaustive process, borne entirely by the Plaintiffs, together with a review by this Court that has taken substantial judicial resources, without FE Partners being put to the option to exercise or forgo purchase of the Yacht or the

22

LLC at the conclusion of that process. Such an election is required under the Judgment Order.

To allow this process to drag out, moreover, would be particularly inequitable in light of the fact that the initial agreement contemplated an option to purchase based on two scenarios: The first premised on a completed contract in which FE Partners would provide up to $7.5 million in loan proceeds and buy the Yacht or the LLC, if at all, at an enterprise value of $13 million; and a second default situation operative here in which the purchase price would be at the reduced default enterprise value of $7.8 million. Given the default, only approximately $2.5 million of loan proceeds were transferred to the LLC. It is unquestionable that the circumstances surrounding the default were the fault of Silversmith and his fraud in connection with the loan. However, at present, the Yacht is unfunded and the uncertainties as to its future cause it to lie deteriorating in a boatyard. Both sides have indicated that it needs major refit to be usable.

All parties consented to this Court determining the final terms of the order carrying out their settlement. I read my Judgment Order as permitting the exercise of the Option once the Sequoia Liabilities were determined by the Independent Counsel and adjusted by this Court. That has occurred.[25] I did not mean to permit the Yacht to lie in limbo until the end of the original contractual Option term of

---

[25] The Independent Counsel should provide a figure for tax liabilities that includes interest and penalties up to the closing date that is to be set by the parties pursuant to this Letter Opinion.

23

July 2017. Therefore, FE Partners must exercise the Option, if at all, within a reasonable amount of time. Under the terms of the Loan Documents, the exercise of the Option becomes irrevocable at closing. A reasonable time for closing is 60 days following the date of this Letter Opinion. The closing date itself may be adjusted by agreement of the parties or, upon cause shown, by this Court upon the application of FE Partners. However, the exercise shall be irrevocable after the original closing date as set by the parties in accordance with this Letter Opinion— such closing date to be no later than 60 days hereof—regardless of when the closing itself occurs. This decision reserves all of FE Partners' remaining contractual rights against the Plaintiffs.

2. Other Relief Sought

In their Motion, the Plaintiffs also seek tolling of interest and shifting of both their and Independent Counsel's fees and expenses onto FE Partners. This litigation, initiated by the Plaintiffs, stems from a loan arrangement that was procured, and litigated upon, in part through the Plaintiffs' fraud. Once FE Partners discovered that fraud and other wrongdoing, the Plaintiffs agreed in the settlement to pay for the costs of the Independent Counsel. Although it is clear to me that FE Partners has not moved the dispute resolution process along with the alacrity that it deserves, I do not find, under the circumstances, that the Plaintiffs are entitled to any legal or equitable tolling of interest or shifting of fees.

*D. Conclusion*

For the foregoing reasons, I find that FE Partners must exercise its Option, if at all, within 60 days of this Letter Opinion at the Default Option Price, as defined by the Judgment Order. The deduction for the Sequoia Liabilities used in reaching the Default Option Price are as stated in the Report of the Independent Counsel, plus any additional interest or penalties accrued by such liabilities by closing.

The parties should confer and submit an appropriate form of order to the Court, which should include a closing date. The parties should also confer and notify the Court as to whether any action is required by the Court on FE Partners' Motion to Take over Possession, Maintenance and Operation of the U.S.S. Sequoia Presidential Yacht in light of this Letter Opinion, which Motion appears to be moot.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III